UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SUSAN HENDERSON,

    Plaintiff,

v.                                                Case No: 6:15-cv-1879-PGB-KRS

SOVEREIGN HEALTHCARE OF
TUSKAWILLA, LLC,

    Defendant.

## ORDER

This cause comes before the Court without oral argument on Defendant's Motion for Summary Judgment and Memorandum of Law in Support Thereof (Doc. 21), filed January 23, 2017. The parties have completed their briefing and the Court is otherwise fully advised on the premises. Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and the parties' respective legal memoranda, the Court will deny Defendant's Motion for Summary Judgment.

## I.    BACKGROUND[1]

Susan Henderson ("Plaintiff"), as power of attorney for her daughter, Brittany Henderson ("Henderson"), sues Sovereign Healthcare of Tuskawilla, LLC ("Sovereign")—the owner and operator of Tuskawilla Nursing and Rehab Center ("Tuskawilla Nursing")[2]—for its alleged violations of the Americans with Disabilities Act of 1990

---

[1]    The Court recites this account of the facts in the light most favorable to Plaintiff.
[2]    Unless indicated otherwise, the Court refers to Sovereign and Tuskawilla Nursing collectively as "Sovereign."

1

("ADA"), 42 U.S.C. §§ 12101–12213, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01–.11.

Henderson is a twenty-six-year-old female with Down syndrome. (Pl.'s Dep. 8:8–12). In 2010, Henderson graduated from high school with a special education diploma, and from 2011 through 2014, she attended a Vocational Rehabilitation Program ("VRP"), which assists and prepares special needs children and adults for independent living and employment. (*Id.* at 11:6–12:18). Due to a lack of success with VRP, Plaintiff discontinued using its services and decided to independently pursue employment for Henderson. (*Id.* at 13:10–17, 15:12–19).

Thereafter, Plaintiff and Henderson enrolled with Quest, Inc., a company that offers vocational training and job placement services to individuals with disabilities. (*Id.* at 13:18–14:21). Quest assigned Henderson a job coach and employment specialist, Lyndsay Gordon ("Gordon"), to assist her with finding a job. (*Id.* at 14:22–15:2). On March 21, 2013, Gordon contacted Mary Ann Gutreuter ("Gutreuter"), the Dietary Manager of Tuskawilla Nursing, regarding a positon as a part-time dietary aide in their food services department. (West Aff. ¶ 10; Doc. 21-2, p. 3; Pl.'s Dep. 30:14–31:4). Gordon believed Henderson was perfect for the job, so she contacted Plaintiff. (Doc. 21-2, p. 3; Pl.'s Dep. 30:19–24).

Henderson applied for the position, and was subsequently interviewed by Gutreuter on March 28, 2013. (Pl.'s Dep. 30:18–32:10; Doc. 21-2, p. 3). After the interview, Gutreuter advised Plaintiff that Henderson's employment was conditioned upon providing two references from the nursing homes at which Henderson had previously volunteered, and a successful Level II background screening. (Pl.'s Dep. 32:21–33:3).

Henderson had difficulty obtaining the required references and Tuskawilla Nursing worked with her and agreed to allow Henderson to submit a reference from a source other than one of the nursing homes. (Pl.'s Dep. 33:4–25).

On April 4, 2013, Tuskawilla Nursing's Human Resources Coordinator, Lisa Sasser ("Sasser"), conducted "a search on [Henderson] through the [Agency for Health Care Administration's] web portal." (West Aff. ¶ 14). Sasser did not find Henderson's fingerprints in the system, which were required to determine eligibility to work at Tuskawilla Nursing. (*Id.*). Thus, Sasser called Henderson to schedule an appointment to be fingerprinted. (Pl.'s Aff. ¶ 8; Pl.'s Dep. 34:11–35:1). When Sasser called, Plaintiff answered. (Pl.'s Aff. ¶ 8). Plaintiff told Sasser that Henderson was not home, but that she would take a message. (*Id.*). Sasser insisted on speaking to Henderson and would not tell Plaintiff why she was calling. (*Id.*). Plaintiff explained that she preferred to act as an intermediary between Sasser and Henderson to ensure that all information was relayed properly. (*Id.*; Pl.'s Dep. 37:22–38:10). When Sasser asked why Plaintiff wanted to act as an intermediary, Plaintiff informed Sasser that Henderson had Down syndrome. (*Id.* at 38:5–12; Pl.'s Aff. ¶ 8). Sasser then "became very rude" and stressed the importance of speaking with Henderson alone. (Pl.'s Aff. ¶ 8). Plaintiff told Sasser that she would have Henderson return her call. (*Id.*). Sasser said she would be in the office until 4 p.m., and until 3 p.m. on Friday, April 5. (*Id.*).

Later that day, Henderson returned Sasser's call. (*Id.* ¶ 9). Sasser instructed Henderson to come to Tuskawilla Nursing the next day for fingerprinting, but to call first to make sure that she was in the office. (*Id.*; Pl.'s Dep. 35:2–5). In accordance with Sasser's directives, on April 5, 2013, at approximately 9:45 a.m., Henderson called

Tuskawilla Nursing to make an appointment. (Pl.'s Aff. ¶ 10). Henderson identified herself and explained the reason for her call, but the receptionist told her that Sasser was out for the day. (*Id.*). Plaintiff "found that strange," and called back a few minutes later. (*Id.*). When the receptionist answered, Plaintiff did not identify herself, she simply asked to speak with Sasser. (*Id.*). The receptionist told Plaintiff that Sasser was on the phone but that Plaintiff could leave a voicemail. (*Id.*). Plaintiff left a voicemail, informing Sasser that Henderson wanted to set an appointment for fingerprinting and asking Sasser to return her call. (*Id.*).

When Sasser did not call back within a half hour, Plaintiff had Henderson call Sasser again at 10:20 a.m. (*Id.* ¶ 11). This time, the receptionist told Henderson that Sasser was on the phone, and asked Henderson to leave a voicemail. (*Id.*). Henderson left Sasser a voicemail with her name and phone number. (*Id.*). Approximately fifteen to twenty minutes passed and Sasser did not return Henderson's call, thus Henderson called and "left [Sasser] another voicemail message in case the other messages had been overlooked." (*Id.*). When Sasser did not call back for more than an hour, Plaintiff and Henderson went to Tuskawilla Nursing to try to speak to her in person. (*Id.* ¶ 12). When Plaintiff and Henderson identified themselves to the receptionist, they were told that Sasser was not in. (*Id.*).

Shortly after noon, Plaintiff again called to speak to Sasser, but the receptionist said that she was on the phone and that Plaintiff could leave a voicemail. (*Id.* ¶ 13). Henderson also called Sasser again at approximately 2:00 p.m. (*Id.*). Henderson was again told that Sasser was on the phone and to leave another voicemail. (*Id.*). Sasser

never returned either Plaintiff's or Henderson's calls or otherwise contacted Henderson to set up an appointment for fingerprinting. (*Id.* ¶ 14).

On April 11, 2013, while Henderson was still proceeding through the hiring process, Gutreuter resigned from Sovereign. (West Aff. ¶ 15). On April 12, 2013, Plaintiff called Tuskawilla Nursing and asked to speak to food services because she wanted to know why Sasser was not returning their calls and why Henderson had not been fingerprinted. (Pl.'s Aff. ¶ 18). At that time, Plaintiff learned that Gutreuter was no longer employed with Sovereign. (*Id.*). Plaintiff then called Gordon to see if Sasser had called to set up fingerprinting, and was told she had not. (*Id.* ¶ 19). At the time, Plaintiff told Gordon that she did not want Henderson working at Tuskawilla Nursing because she did not feel Plaintiff would be safe without Gutreuter working there. (*Id.*). Plaintiff also told Gordon that she was going to file a discrimination charge. (*Id.*). Gordon convinced Plaintiff to allow Quest to pursue completion of Henderson's hiring process, and Plaintiff agreed (*Id.* ¶ 24).

Neither Sasser nor anyone else at Tuskawilla Nursing contacted Plaintiff or Henderson to complete the fingerprinting process. (*Id.* ¶ 20). On April 25, 2013, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 21). In mid-May 2013, after Plaintiff filed the charge of discrimination, Sasser called Quest and requested that they send someone to Tuskawilla Nursing to work in food services. (*Id.* ¶ 23). Sasser stated that Henderson was her first choice. (*Id.*). When this information was relayed to Plaintiff, she told Gordon that Henderson would not be taking the job. (*Id.*; Pl.'s Dep. 41:4–42:7).

Sometime thereafter, the EEOC notified Plaintiff of her right to sue, and she brought suit against Sovereign on November 5, 2015. In the Complaint, Plaintiff asserts

5

claims for disability discrimination under the ADA and the FCRA. Sovereign now moves for summary judgment on both claims.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials," but may also consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*

6

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the FCRA prohibits employment discrimination on the basis of an individual's disability. *See* Fla. Stat. § 760.10(1). Because disability discrimination claims under the FCRA are analyzed using the same framework as ADA claims, *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263–64 (11th Cir. 2007) (per curiam), the Court examines Plaintiff's claims together.

A plaintiff can establish a claim for disability discrimination using either direct evidence or circumstantial evidence of discrimination. *Curry v. Sec'y, Dep't of Veterans Affairs*, 518 F. App'x 957, 963 (11th Cir. 2013) (per curiam). When the plaintiff relies on circumstantial evidence to support her claim, as is the case here, the Court applies the *McDonnell Douglas* burden-shifting framework. *See Wascura v. City of S. Miami*, 257

7

F.3d 1238, 1242 (11th Cir. 2001).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden of production then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory conduct. *Id.* Once the employer articulates a non-discriminatory reason for the conduct in dispute, the plaintiff is left with the ultimate burden of proving that the employer's proffered non-discriminatory explanation is not the true reason for its conduct, but merely a pretext for discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08 (1993).

### A. Prima Facie Case

To establish a prima facie case of disability discrimination, Plaintiff must show that Henderson: (1) is disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of her disability. *Carruthers v. BSA Advert., Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004) (per curiam). For purposes of its summary judgment motion, the first prong is undisputed, as Sovereign concedes that Henderson has Down syndrome and is therefore disabled. (Doc. 21, p. 9). Sovereign disputes, however, that Henderson is a qualified individual and that she was subjected to unlawful discrimination because of her disability.

#### 1. Qualified Individual

The ADA defines a "qualified individual" as someone with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Accordingly, Plaintiff "must show either that [Henderson] can perform the essential

8

functions of [her] job without accommodation, or . . . with a reasonable accommodation." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005).

Although Sovereign contends that Henderson was not qualified for the dietary aide position, it has proffered no evidence showing that Plaintiff could not perform the essential functions of the dietary aide position, with or without an accommodation. Sovereign simply argues that Henderson was not qualified because she stopped the hiring process before providing fingerprints. However, as discussed in further detail below, there remains a genuine issue of material fact as to whether Henderson failed to submit her fingerprints or whether Sasser discriminated on the basis of Henderson's disability and deliberately refused to allow Henderson to submit fingerprints.

Furthermore, construing the facts in a light most favorable to Henderson, this Court cannot conclude that Henderson was not a qualified individual. It is undisputed that after Henderson applied for the dietary aide position and was subsequently interviewed by Gutreuter, Gutreuter found that Henderson performed well and requested that Henderson provide two references in continuation of the hiring process. Henderson then produced, and Sovereign accepted, two references and invited her to undergo a background check. Henderson cooperated with the background check and attempted to set up a fingerprinting appointment with Sasser. Based on these facts, a reasonable jury could find that Plaintiff was qualified for the job.

      2.  *Unlawful Discrimination Based on Disability*

Sovereign contends that Henderson was not unlawfully discriminated against based on her disability and that Henderson voluntarily withdrew her application for employment with Sovereign. (Doc. 21, pp. 5–6). Plaintiff, on the other hand, argues that

issues of material fact exist as to whether Sasser refused to complete the hiring process based on Henderson's disability or whether Henderson voluntarily chose not to complete the hiring process. Plaintiff further argues that there is sufficient circumstantial evidence which would allow a reasonable jury to conclude Sasser unlawfully discriminated against her based on her disability.

In support of its position that Henderson voluntarily withdrew her application for employment, Sovereign does not provide the Court with affidavits from the individuals involved with Henderson's hiring process (*i.e.* Gutreuter, Sasser, and Gordon). Instead, Sovereign relies heavily on the affidavit of Jack West, Jr. ("West"), the Corporate HR Manager for Southern HealthCare Management, LLC, which is the management company for Sovereign. (West Aff. ¶ 2).

In his affidavit, West states that Sovereign considered Henderson to have withdrawn her application for employment because, on April 17, 2013, Gordon told Sasser that Plaintiff would not allow Henderson to accept the dietary aide position. (*Id.* ¶¶ 18, 19). However, West's assertions conflict with other record evidence. According to Plaintiff, she did not tell Gordon that Henderson would not accept the position until mid-May, after Plaintiff had already filed a charge of discrimination against Sovereign. (Pl.'s Dep. 41:4–45:7; Pl.'s Aff. ¶¶ 23, 24). Plaintiff admits that she told Gordon on previous occasions that she did not want Henderson to work at Tuskawilla Nursing, but Plaintiff explains that Gordon convinced her to let Henderson continue with the hiring process, and Plaintiff acquiesced. (Pl.'s Aff. ¶ 24).

Sovereign argues that the record belies Plaintiff's testimony because it is inconsistent with Gordon's progress notes, dated April 12, 2013, which indicate that

"[Plaintiff] decided that [Henderson] would not be taking the job." (Doc. 32-1, pp. 58, 60). However, weighing the evidence and judging the credibility of witnesses are quintessential functions for the trier of fact, not the Court. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993). In ruling on a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson*, 477 U.S. at 255. Drawing all reasonable inferences in the light most favorable to Plaintiff, the Court finds that genuine factual disputes remain as to whether Plaintiff told Gordon that Henderson would not accept the dietary aide position in April 2013. Likewise, issues of fact remain as to whether Gordon then told Sasser that Henderson would not be accepting the position on April 17, 2013.

Sue Koziol, the Vice President of Vocational and Business Services for Quest, testified that the employment specialist, including Gordon, were required to make progress notes to document conversations and dealings concerning each client. (Koziol Dep. 11:8–25). These progress notes varied, but the employment specialist was required to document: (1) communications with potential employers regarding the client, (2) actions taken to assist a client in finding employment, and (3) the outcome of that particular activity. (*Id.*).

Here, the evidentiary record reflects that Gordon documented several communications she had with Henderson's potential employers, including Tuskawilla Nursing. (*See* Doc. 32-1, pp. 39, 44, 53, 56, 57, 59, 60). In fact, Gordon recorded communications that she and other Quest employees had with Sasser. (*See id.* at pp. 56, 57, 60). Notably, however, Gordon's progress notes do not reflect that she spoke to Sasser on April 17, 2013. Nor do Gordon's progress notes indicate that she ever told

11

Sasser that Henderson would not be accepting the dietary aide position. (*See id.* at pp. 59–60 (documenting actions Gordon took on April 17, 2013)). Given the absence of any record of Gordon's alleged conversation with Sasser, a jury could find that Gordon never recorded the conversation in her progress notes or that the conversation simply never occurred.[3]

Construing the facts in the light most favorable to Plaintiff, there is sufficient circumstantial evidence in the record to support her assertion that Sasser discriminated against Henderson based on her disability. Before Sasser had any knowledge that Henderson was disabled, she conducted a preliminary background check through the AHCA web portal. Because Henderson's fingerprints were not in the AHCA system, Sasser attempted to contact Henderson about scheduling a fingerprinting appointment. (Pl.'s Aff. ¶ 8). However, upon learning that Henderson was disabled, Sasser made no further attempts to schedule a fingerprinting appointment for Henderson. (*Id.* ¶¶ 10–14). Plaintiff and Henderson called Sasser multiple times and even visited her office to schedule an appointment, but Sasser never returned their calls. (*Id.*). Instead, Sasser called Quest to "check references" and confronted Gordon about Quest's request to have a job coach present at Tuskawilla Nursing for a period of time to accommodate

---

[3] The Court notes that the only documented conversation between Gordon and Sovereign regarding Henderson's change of interest in the dietary aide position occurred on May 28, 2013. On this date, Gordon purportedly sent an email to Sovereign stating that Plaintiff had decided not to let Henderson take the position because she did not feel comfortable letting Henderson work at Sovereign without Gutreuter there. (*See* Doc. 21-1, p. 7; Doc. 29-1, ¶ 20). Absent from Gordon's email, however, are any facts indicating that Gordon informed Sasser or anyone else at Sovereign that Henderson would not be accepting the dietary aide position prior to May 28, 2013.

Henderson and ensure that she understood her responsibilities as a dietary aide. (Doc. 32-1, p. 56; West Dep. 9:19–25).

In addition, Sasser spoke to West and expressed her concerns about working with Quest to fill the dietary aide position. However, West advised Sasser that it "was absolutely fine," that "[i]t was consistent with [Sovereign's] affirmative action obligations, and if [Henderson is] the most qualified candidate, [Sovereign] should certainly hire her." (West Dep. 9:14–25). Still, Sasser never contacted Henderson to schedule a fingerprinting appointment. It was not until after Plaintiff filed a charge of discrimination against Sovereign that Sasser called Quest and expressed her desire to hire Henderson. (Pl.'s Aff. ¶ 23).

In light of the timeline of events, a reasonable jury could find that Sovereign discriminated against Plaintiff on the basis of her disability by thwarting her ability to complete the hiring process.

### B. Sovereign's Legitimate Reasons and Pretext

Sovereign asserts that it did not hire Henderson because "Plaintiff advised Quest that . . . Henderson . . . would not be accepting the job." (Doc. 21, pp. 11–12). Plaintiff therefore bears the ultimate burden of persuading the jury that Sovereign's proffered reason for not hiring Henderson is not the true reason for its actions, but merely a pretext to illegally discriminate against Henderson. Sovereign submits that the evidence on summary judgment is insufficient for Plaintiff to do so.

"To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the

real reasons for the adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)) (internal quotation marks omitted). In other words, the employee must adduce evidence which exposes "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).

As discussed above, there is sufficient evidence in the record calling into question whether Plaintiff withdrew Henderson's employment application as Sovereign contends. Plaintiff explains that, while she was hesitant to let Henderson continue with her application because of how Henderson had been treated so far, Plaintiff ultimately agreed with Gordon's recommendation to allow the hiring process to proceed. (Pl.'s Aff. ¶¶ 17–20, 24). A rational jury could conclude that Plaintiff's explanation of the events directly contradicts Sovereign's stated reason for not hiring Henderson.

Further, there is evidence in the record suggesting that, after learning Henderson had Down syndrome, Sasser acted to undermine Henderson's employment application with Sovereign. Although Plaintiff and Henderson called Sasser several times to coordinate an appointment for Henderson to submit her fingerprints, Sasser never returned their calls, in an apparent attempt to dodge the obligation. In fact, Sasser's receptionist advised Henderson the first time she called that Sasser was out for the day; however, when Plaintiff called moments later, the same receptionist stated that Sasser was in the office, but on another phone call. From these facts, a rational jury could find

14

that Sasser held a discriminatory animus toward Henderson due to her disability and that this animus served as Sovereign's true reason for not hiring Henderson.

Additionally, after receiving notice of Henderson's EEOC charge of discrimination, Sasser called Gordon to relay that Sovereign was interested in hiring Henderson for another position. However, given the circumstances of the situation and the obvious potential for litigation, a rational jury could conclude that Sasser's offer was nothing more than an empty gesture fabricated to rebut any accusations of discrimination. Accordingly, the Court finds that sufficient evidence in the record exists for Plaintiff to prove to the jury that Sovereign's proffered non-discriminatory reason for not hiring Henderson was actually a pretext to engage in discrimination.

As a final matter, Sovereign's argument that it cannot be held liable for Sasser's conduct is unavailing. Sovereign maintains that Sasser had no authority regarding whether Henderson would be hired and that, as a result, Sasser's conduct cannot serve as a basis to impose liability on Sovereign. In support, Sovereign relies on West's affidavit, wherein he states that "Sasser was not authorized to hire anyone on behalf of the company and was not the person in charge of, or responsible for, filling the dietary aide position." (West Aff. ¶ 13). "Sasser merely processed new hire paperwork." (*Id.* ¶ 13).

However, even if a biased employee is not the final decision-maker, a plaintiff can establish that the employee's conduct is attributable to the employer by proving that the employee acted on behalf of the employer and influenced or was involved in the employer's decision or decision-making process. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Based on the record evidence in this case, it appears that Sasser acted

on Sovereign's behalf during the hiring process and played a pivotal role in Sovereign's decision not to hire Henderson. Before learning that Henderson was disabled, Sasser conducted a preliminary background check on Henderson and called Henderson to set up a fingerprinting appointment. However, upon learning that Henderson was disabled, Sasser called Quest to "check references," and she expressed concern about having a job coach at Tuskawilla Nursing to accommodate Henderson. Further, if Plaintiff's version of the facts is believed, Sasser deliberately refused to complete Henderson's background check even after West told her that Sovereign should hire Henderson if she was qualified for the position. As a result, a genuine factual dispute remains as to whether Sovereign can be held liable for Sasser's conduct.

## IV. CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 21) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on April 17, 2017

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record